# CHARLESTON.

WILLIAMSON *et al. v.* JONES *et al.*

Submitted February 1, 1894.—Decided April 4, 1894.

1. SALE.

A person who causes his land to be sold for some purpose of his own under a judicial proceeding, which turns out to be void, and receives and retains the proceeds of sale, can not afterwards be heard to question its validity. He has made his election.

2. SALE—ESTOPPEL.

If such person afterwards stands by and sees the purchaser expend large sums in developing oil on the property, he may not afterwards set up such defect in the purchaser's title; he is estopped.

3. PETROLEUM.

Petroleum or mineral oil in place is as much a part of the realty as timber, coal, iron ore, or salt water

4. PETROLEUM—REMAINDER—DISHERISON—INJUNCTION.

It is a part of the inheritance, and an unlawful removal thereof is a disherison of him in remainder constituting waste, which a court of equity in a proper case will restrain and enjoin.

5. REMAINDER—PARTIES.

A case in which the remainder created by the will is *held* to be

39 231
39 509
39 231
41 566
39 231
42 438
39 231
43 565
43 580
43 835
39 231
45 810
39 231
50 347
39 231
e 52 579
39 231
53 215
j 53 222
39 231
54 536
39 231
59 253
59 621
39 231
65 536

vested, not contingent, and those in remainder not to be parties to the suit by representation.

CALDWELL & CALDWELL for appellant:

1.—*The Circuit Judge erred in not prescribing the condition of the increased and additional injunction bond mentioned in the said order of the Circuit Court.*—Code, c. 133, s. 10.

2.—*The Circuit Judge erred in requiring an additional injunction bond in the penalty of only $12,000, instead of at least in the penalty of $70,000. Capt. Jones was sure to incur a certain loss of $22,400, and by reason of the injunction was in constant and imminent danger of losing $134,000 by the oil catching fire from lightning or otherwise, and two injunction bonds aggregating only $14,000 were insufficient.*—6 W. Va. 539, 527; Code, c. 10, s. 6.

3.—*The Circuit Judge erred, first, in not "fixing" in his order the reasonable time within which the additional injunction bond should be given; second, and in not providing that if the new bond should not be given within such time the injunction should thereupon be dissolved until such bond should be given.*—17 W. Va. 396, p't 2 Syll.

4.—*The Circuit Judge erred in refusing to read on the hearing on the 14th day of November, 1893, of the motions to dissolve the injunction in part and entirely, the affidavits which had been filed by the defendant Jones on or before October 17, 1893.*—And. Law. Dic. 346, under "Depositions"; Black's Law Dict. defining "Affidavit;" High Inj. § 1010; Code, c. 133, s. 3; 2 Bart. Ch'y § 137; 2 Dan. Ch'y (5th Ed) 1598, 1676; 4 Rand. 3, 4; 6 W. Va. 108; 11 W. Va. 477.

5 —*The Judge of the Circuit Court erred in not dissolving the injunction as to three tenths of the land in controversy.*—12 W. Va. 313; 11 W. Va. 464; 24 W. Va. 698, p't 1, Syll.; Her. Estop. (2d Ed.) §§ 1069, 1220; 61 Ia. 644; 12 Colo. 434; 102 U. S. 415; 38 N. Y. 275.

Mrs. Williamson can not deny the authority of her attorney to bring about the sale.—24 W. Va. 692, p't 2 Syll.; Free. Void. Jud. Sales § 50.

6.—*Under the equitable doctrine of representation, by Mrs. Williamson, the life tenant, her sisters and sister's children were constructive parties to the proceedings in which the land was*

*sold and the whole injunction ought to have been dissolved by
the Circuit Court.*—13 Gratt. 152 ; 18 Gratt. 683, *etc.*

7.—*The injunction should have been dissolved, because it never
ought to have been granted, even if Capt. Jones had been a
mere trespasser, he being entirely solvent.*—24 W. Va. 698 ;
20 W. Va. 181; 3 Pom. Eq. Jur. § 1348.

8.—*If Capt. Jones was rightfully in possession, and committed
waste, yet there was no irreparable injury, and he being solv-
ent, pecuniary compensation would have been complete redress
and the injunction should have been refused.*—2 Beach Eq.
Jur. §§ 728, 720 ; Kerr Inj. § 199.

9.—*"An injunction to stay waste is never granted against a de-
fendant in possession and claiming by title adverse to that of
the plaintiff."*—10 Am. & Eng. Ency. L. & E. 823.

   *a.*—But there was no waste.—28 W. Va. 210, 218, 220.
   2 Blackst. Com. 281; 6 Barb. 14; 26 Wend. 122 ;
   2 Hill 167 ; 107 U. S. 393 ; 3 Pom. Eq. Jur. § 1348;
   1 Washb. Real Property, t. p. 132, 133 ; 3 Blackst.
   Com. 223 ; 7 John. 232.

10.—*The necessity for considering the case fully.*—High Rec.
§§ 739, 737, 11, 558, note 3 to § 5, § 3 ; 4 H. L. Rep.
997 (3 Mac. & G. 379, 411); 2 Bland. 31; 57 Pa.
St. 91.

11.—*Mrs. Williamson was estopped by accepting the proceeds of
sale.*—2 Herm. Estop. (2d Ed.) § 1069 ; 61 Ia. 644 ; 87
Ala. 584.

12.—*This is true even if the court had had no jurisdiction.*—12
Colo. 434; Herm. Estop. (2d Ed.) § 1220 ; 114 Ill. 594 ;
29 Ill. 137; 76 Ind. 452 ; 64 Wis. 538 ; 112 Pa. St. 598 ;
92 N. Y. 181 ; 80 Ill. 208 ; 102 U. S. 415 ; 5 Bush. 230 ;
150 Mass. 353 ; 35 W. Va. 375.

13.—*The payment has the same effect as a conveyance.*—28 N.
Y. 275 ; Freem. Void Jud. Sales § 50 ; Black's Law
Dict. under "Possession ;" 27 W. Va. 428.

15.—*All the interests in the farm were liable to be sold to pay
the debts of Thomas Jones.*—Code of 1849, c. 131, s. 3, 5 ;
Code of 1860, c. 131, s. 3, 5.

16.—*The burden of proof is on him who asks to be protected as
a bona fide purchaser for value without notice.*—10 Peters
(U. S.) 211; 104 U. S. 505 ; 11 Wall. 139.

17.—*Pendente lite purchasers are not necessary parties.*—14 Gratt. 402; 30 Gratt. 515.

18.—*The remainder people, if they ought to have been represented in the Joshua Russell suit, could only be so as to eight fifteenths of the remainder, after Mrs. Williamson's life estate. There was no merger of the liens against the land.*—And. Law Dict. under "Merger of Estates;" 91 N. Y. 473; 46 Pa. St. 444; 3 Dak. 21.

    *a.*—None of the land was released from these liens by the executor of David Hickman.—91 N. Y. 470 and 476; 2 Pom. Eq. Juris. §§ 788, 798, 791, 799 and 787; 2 Blackst. Com. 157; 11 Com. B. N. S. 209, 233; 7 Hurl. & N. 507; Cro. Jac. 275; 2 Lom. Dig. s. p. 241, t. p. 405.

19.—*To adjudge the liens not merged, when they were merged, would only have been error, and the jurisdiction of the court would not have been lost.*—1 Black. Judg. § 244; 27 Gratt. 624; 22 W. Va. 356, 371, 372.

20.—*What constitutes jurisdiction over the subject-matter.*—Freem. Void Jud. Sales § 3; And. Law Dict. under "Jurisdiction;" 18 Wall. 461, 468; 10 Wall. 316, 317 and 321; 1 Black Judg. §§ 240, 241 and 216; 72 N. Y. 217, 218, Syll.; 18 S. E. Rep. 577; 18 S. E. Rep. No. 13, p. 456.

21.—*If a judgment is merely erroneous, the title acquired by a sale under it is valid and can not be impeached collaterally.*—1 Black Judg. § 218; 37 W. Va. 173; 29 W. Va. 795; 33 W. Va. 553; 20 W. Va. 351; 22 W. Va. 475; 29 W. Va. 794; 25 W. Va. 707; 12 W. Va. 1; 27 Gratt. 628; 10 Pet. 449, 474.

22.—*Where the record shows that a party appeared by attorney, the authority of the attorney can not be questioned in a collateral proceeding.*—25 W. Va. 701 to 704; 6 Call 83.

Statements in the plaintiffs' bill contradicting its exhibits.

23.—*Under David Hickman's will if Mrs. Williamson's sisters had vested remainders, these vested remainders were subject to the contingency of being defeated by her leaving by will the land to her sisters' children, and such vested remainders possess the essential qualities of contingent estates.*—4 Kent's Com. 204; 35 W. Va. 524.

24.—*Mrs. Williamson, the life-tenant, was the representative party and there was no necessity for making her sisters or their children parties to the proceedings in which the land was sold, because their interests were all by way of remainder, subject to the contingency of Mrs. Williamson's exercise of her power of appointment. They were constructive parties by Mrs. Williamson, as their representative.*—13 Gratt. 164–170 ; 18 Gratt. 683–695 ; 89 Va. 789 ; 80 N. Y. 326.

25.—*The decree of 1862 did not render the subsequent decrees void. It was not the kind of a final decree which put the parties out of court, or prevented the court from making the subsequent decrees, all of which merely provided for carrying into execution the decree of 1862.*—24 W. Va. 693–695 ; 25 W. Va. 135 ; 27 W. Va. 782, 783 ; 27 W. Va. 597 ; 36 W. Va. 130, 131.

26.—*By filing their petition as assignees of the liens the executor of David Hickman and Mrs. Williamson became parties to the consolidated suits to enforce the liens against the land, and the Circuit Court had jurisdiction over them, although the jurisdiction was not material to the validity of the sale as to her interest in the land.*—18 W. Va. 693 (p't of Syll. 5) 694 ; 23 W. Va. 760 ; 22 W. Va. 404 ; 49 Ia. 627 ; 29 Ohio St. 620.

27.—*The plaintiffs' bill is not a bill of review.*—2 Rob. (Old) Pr. 418 ; 4 H. & M. 243 ; 2 H. & M. 591, note ; 18 Gratt. 376 ; 12 W. Va. 394 ; Code, c. 133, s. 5 ; 2 Rob. (Old) Pr. 418 ; 36 W. Va. 210 ; 8 W. Va. 175 (p't 7 Syll.) 187.

28.—*The plaintiffs are estopped by laches and their bill should be dismissed.*—91 U. S. 593 ; 8 De G. M. & G. 813.

29.—*Laches is not limitation, a mere matter of time, but principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties.*—145 U. S. 372, 373 ; 91 U. S. 587, 591, 592 ; 17 Wall. 78 ; 95 U. S. 157 ; 96 U. S. 611 ; 116 U. S. 33 ; 125 U. S. 90 ; 134 U. S. 305, 308, 309 ; 36 Ill. 398 ; 23 A. R. 452 ; 25 N. E. Rep. 636 ; 22 N. Y. 352 ; 52 N. W. Rep. 638 ; 85 Cal. 522 ; 34 W. Va. 217 ; 23 Pac. Rep. 908 (a judicial sale); 90 Mo. 239 (a mortgage foreclosure sale) ; 39 N. J. Eq.

203, 517; 89 Ind. 38; 40 N. Y. 181; 72 N. Y. 526; Ambl. 645; 71 N. Y. 333; 78 N. Y. 111; 24 Fed. Rep. 869 (9 Sawyer C. Ct. 354).

30.—*Elements of estoppel by conduct. Gross negligence construed in equity to amount to constructive fraud, and the intention that the other party should be deceived and act upon the concealment of material facts is presumed, in estoppel by passive conduct, or when one is silent when he ought to speak.* —Big. Estop. 452 to 467, page 453, note 1; And. Law Dict. under "Estoppel," page 416; 145 U. S. 372.

31.—*Plaintiffs must assert their rights without "delay and promptly" when large expenditures are being made on property under belief of good title, etc.*—143 U. S. 568 and 570; 91 U. S. 592; 148 U. S. 370; 146 U. S. 99; 47 N. J. Eq. 119.

32.—*Oil property requires, and of all property the most requires, the parties interested in it to be vigilant and active in asserting their rights. There should be no delay on the part of the claimants in deciding whether they will share in the risks or stand clear of them. They must not play a game in which they alone risk nothing.*—1 You. & Col. s. p. 110; 91 U. S. 593, 587; 8 De G. M. & G. 787, 813; 145 U. S. 373; 6 H. L. Cases 633, 656; 148 U. S. 370; 145 U. S. 317, 334; 143 U. S. 553, 567; 143 U. S. 224; 14 Colo. 90.

33.—*The true owner is estopped when he stands by in silence with knowledge that the buyer is putting improvements upon the property in good faith upon a mistaken notion as to his title to the land without the timely warning he should have had to dispel his delusion, although the buyer might have discovered the true situation of the title by examining the record.* —2 Pom. Eq. Jur. § 810; 47 N. J. Eq. 103.

This last case shows that Mrs. Williamson and the other plaintiffs must be presumed to have had such knowledge as above referred to.

34.—*The estoppel applies to infants and married women.*—26 W. Va. 207, 176 (p't 3 Syll.); 2 Herm. Estop. §§ 1120, 1121; 17 S. W. Rep. 589 (55 Ark. 85).

35.—*Where a part of the grantors in a sale under a mortgage neglected to have themselves made parties to a suit brought to have the sale rescinded, they are concluded by the judgment in*

*such suit.*—Albert *v.* Hamilton, 25 At. Rep. 341 (76 Md. 304); Same principle, Robbin *v.* Chicago, 4 Wall. 656, 674.

36.—*The court of equity applies the rule of laches according to its own ideas of right and justice. Every case is governed by its own circumstances.*—95 U. S. 160.

37.—*There was no irreparable injury and therefore whether Capt. Jones was a trespasser or committed waste, no injunction should have been granted to plaintiffs.*—3 Pom. Eq. Jur. § 348.

38.—*The law of this state is shown by* 24 W. Va. 698; 20 W. Va. 181; 26 W. Va. 606; 2 Beach Eq. Jur. §§ 728 and 720; Kerr Inj. § 199.

39.—*There can be no irreparable injury where pecuniary compensation is full and complete compensation. The plaintiffs in this case want the oil pumped and sold.*—6 John. Ch'y 497 and 499; 7 John Ch'y 315, 333.

40.—*Whether the waste is producing what is technically considered irreparable injury or not, "an injunction to stay waste is never granted against a defendant in possession and claiming by title adverse to that of the plaintiff."*—10 Am. & Eng. Ency. L. & E. 824; 71 Ga. 374; 2 Miss. (1 Howe) 108; 26 Kan. 70; 76 Va. 306; Levinger's Appeal; 106 Pa. St. 398, Syll. —

41.—*It is true that one having a lien on the land, and suing to enforce the same, will be granted an injunction if the waste is impairing the security, but even in such a case the bill must allege impairment.*—35 W. Va. 287, 291, 296; 20 W. Va. 169–173.

    *a.*—But an injunction in restraint of waste will not be granted on a hypothetical or disputed title.—6 Vesey 787; 1 Brown 57.

42.—*No man has a right to sue for what does not injure him, and the taking of the oil by Capt. Jones worked no injury to the remainder people.*—1 Harris 438; 8 Bac. Ab. 379, 382; 3 Blackst. Com. 325.

43.—*Petroleum oil, water and gas are the subjects of qualified property acquired only by occupancy, possession and appropriation, and can not be the subjects of compensation for "waste" or appropriation, whether the access to them is right-*

*ful or wrongful. The petroleum oil is not the property of the owner of the land.*—28 W. Va. 210, 218, 220 ; 131 Ind. 277 ; 130 Pa. St. 249 ; 2 Kent's Com. 347 ; 2 Washb. Real Property 327 (72) ; 12 M. & W. 324 ; 9 Pick. 15 ; 4 C. & P. 131 (19 Eng. C. L. 441) ; 1 Hawk. 144, § 25, 26 ; 1 Sprague 315 ; Cool. Torts 435, 436 ; 2 Blackst. Com. 15 and 18.

44.—*Cutting wood which is dead, or which would die before the life-estate would end and the timber thus come to the remainderman is not waste. So with the oil which would be taken by the neighbors before the life-estate would fall in.*—8 Bac. Ab. 394 ; 110 Pa. St. 477.

45.—*If Capt. Jones is a mere life-tenant, yet the remaindermen have no right by themselves or through receivers to violate his possession. He is under no obligation to produce oil or allow it to be produced on the premises for their benefit.*—1 Washb. Real Property 110.

46.—*It was error for the Circuit Court to enjoin the Pipe Line and the defendant Jones as to the oil which he had already produced, or its proceeds.*—5 John. Ch'y 169.

47.—*The omission of the Circuit Court to require the commissioner to make the sale to give bond was at most only error, and the decree of sale can not be questioned on account thereof in this collateral way.*—27 W. Va. 681 ; 26 W. Va. 691 ; Code, c. 132, s. 1.

　　*a.*—The omission to require bond in the decree of sale was error without prejudice to any one.—21 W. Va. 132 ; 24 W. Va. 696 and 697 ; 27 Gratt. 630.

48.—*The affidavits filed on behalf of the defendant Jones are entitled to great credit, because there is no evidence to contradict them, and because plaintiffs had abundant time to produce any such counter affidavits, and did not ask for any further time.*—4 Rand. 3, 4.

49.—*The appointment of receivers is a severe measure not to be adopted except in an urgent and strong case, is always reluctantly made, and a court of equity, in such a case as the one at bar, should not have departed from "its ordinary course of administering justice," at least until a final hearing of the case.*—4 Gratt. 209 ; 28 Am. & Eng. Ency. L. & E. 16, 18 ; 27 W. Va. 90.

T. J. STEALEY and J. H. McCOY for appellees :

1.—*On construing the will.*—4 Kent. 198, 203, 324, 325, 345; 2 Jar. Wills 131, 258, 264-5; 2 Wash. Real Prop. 658; 1 Lom. 418; 2 Lom. 152.

2.—*On power of appointment.*—4 Kent. 343; 35 W. Va. 524; 2 Jar. Wills 265, 266; 6 Munford 352; 9 Wheat. 194; 2 Sug. Pow. 246; 73 A. D. 186; 3rd Rapalge D. 2739; 1 Ves. 57; 5 Ves. 857; 16 Ves. 22; 4 Ran. 566.

3.—*On the effect of changing the decree* 1862.—24 W. Va. 279; 76 W. Va. 63, 771.

4.—*On void decrees and judgments and sales.*—Free. Void Jud. Sales § 3, pp. 18, 19; 1 Black Judg. § 219, 220; 7 Leigh 225; 82 Va. 359; 20 W. Va. 539.

5.—*On extinguishment of liens.*—17 A. S. R. 131; 1 Black Judg. § 447; 2 Black §§ 441, 999, 995; 12 A. D 577; 48 A. D. 734; 19 A. D. 411.

6.—*On merger.*—2 Pom. §§ 251, 626, 798, 794, 797, 791, 792, 793-800; 2 Black. Judg. § 991; 22 Gratt. 614-624.

7.—*Oil part of realty.*—31 A. S. R. 435; 20 Ind. 575; Gould on Water (2nd Ed.) 291; 80 Pa. St. 142; 64 A. D. 727; At. Rep. Nov. 5, 1893.

8.—*Attorneys can not assign judgment.*—2 Black Judg. § 441; 12 A. D. § 577.

9.—*Plaintiff''s right to remedy by injunction.*—113 U. S. 537; 26 W. Va. 1; 3 Pom. § 1334, sub. div. 9; 2 Washb. Real Prop. 554, § 23; High Injunc. §§ 451, 452, 468, 467, 470.

10.—*Equitable estoppel.*—93 U. S. 326; Big. Estop. (2nd Ed.) 437, 129.

11.—*No suit brought before sale by heirs.*—Code Va. 1849, c. 131, s. 5.

12.—*Appointment of receivers.*—15 W. Va. 431; Sto. Eq. p. 832; High. Rec. 725; 3 Pom. 1331; Beach. Rec. § 7.

JOHN A. HUTCHINSON for appellees.

1.—*The debts decreed in the Peden and Russell suits were paid off and discharged by the executor, Christian Engle, in June, 1864, as shown by the answer of J. T. Jones, and exhibits filed therewith. And they were extinguished.*—2 Pom. Eq. §§ 788, 790, 794, 796, 798; 29 Beav. 199-204; 8 Am. Dec.

465; 121 Mass. 595; 5 Allen 490; 16 Sim. 647; 19 N. H. 487; 7 Barb. 22; 1 N. J. Eq. 100; 130 Ind. 305 (30 Am. St. 237); 9 Paige Ch'y 241; 4 Rand. 199; 12 Am. Dec. 412–414; 10 N. Y. 402 (61 Am. Dec. 751); 1 Per. Trusts, § 127 (4th Ed.); 1 Johnson's Chan. 620–629; 1 Johnson's Chan. 508; 23 W. Va. 723.

2.—*The payment and extinguishment, by the executor, of the debts decreed, terminated the jurisdiction of the Circuit Court over the property in question, and any order or decree made subsequent to June, 1864, is void, and any sale made under any such decree or order is not valid, and is ineffectual for any purpose.*—55 Wis. 607; 74 Wis. 210; 39 Conn. 462; 42 Barb. 192; 5 John. 267; 36 Wis. 295; 82 Va. 369; 48 Am. Dec. 734; 1 Paige Ch'y 181; 5 Cow. 671; 84 Va. 806.

3.—*All the proceedings from 1864, to and including the sale and confirmation, as shown in the record in the consolidated cases referred to, were null and void so far as they affected the interest of the life-tenant and those in remainder, and so far as they affected the interest of Eliza Williamson in her her own right to three tenths of land in controversy*—35 W. Va. 57; 16 Gratt. 264; 26 W. Va. 22, 23; 133 Mass. 464–465; 6 Cush. 560; 15 Grey. 52; 14 Grey. 521; 117 Mass. 76; 115 U. S. 148, 149; 1 Munf. 160; 140 U. S. 264–271; 34 N. J. Law 413.

4.—*The proceedings under the decrees of December, 1881, and of April, 1882, are null and void, because by the will of David Hickman his executor had no power or authority over any part of the interest devised to Mrs. Williamson for life.*—30 Am. Dec. 552; 4 Munf. 200; 1 How. (U. S.) 561; 10 Peters 161; 3 W. Va. 200; 8 W. Va. 1; 10 W. Va. 637, 638; 21 Gratt. 60; 3 Leigh, 161–193; 1 Perry Trusts (4th Ed.) § 224; 15 Pet. 93; 2 Wash. 68; 73 Mich. 67; 36 N. Y. 581; 21 Cal. 24; 76 Mich. 375.

5.—*An executor can not apply for permission, nor are the Courts authorized to sell real estate, until all the parties in interest are before the court or have the opportunity to be.*—87 Am. Dec. 245; 65 Am. Dec. 75; 61 Am. Dec. 566; 75 Am. Dec. 49; 81 Am. Dec. 219; 84 Am. Dec. 737; 37 Am. Dec. 299; 40 Am. Dec. 477.

6.—*The petition filed by C. Engle, executor, etc., in 1881, in the consolidated causes could not and did not make Engle and Mrs. Williamson defendants.*—7 Leigh. 224; 16 W. Va. 724–730; 27 W. Va. 633; 18 W. Va. 184; 30 W. Va. 261, 272; 29 W. Va. 469.

7:—*But if the petition brought Mrs. Williamson into the suits as a party defendant, her action, consent or acquiescence does not preclude those entitled in remainder under the Hickman will. They were not made parties and are not bound by the decrees*—22 W. Va. 303–307; 10 W. Va. 130; 30 W. Va. 261–272.

8.—*The sale made by Benjamin Engle, commissioner, to J. C. Tennent in December, 1891, of the land in controversy, was without any legal authority. None of the decrees ordering a sale of the property required any bond of either of the old commissioners or of Benjamin Engle.*—Acts of 1882, 142; Code, 1891, c. 132, s. 1.

9.—*The court having no jurisdiction, for the reason stated, to decree any sale of the lands in controversy, the purchaser at the sale, J. C. Tennent and J. T. Jones, Tennent being the agent of Jones in making the purchase, obtained no title whatever.*—26 W. Va. 1, 30, 31; 93 U. S. 335.

10.—*The claim that Mrs. Williamson was estopped by any matter alleged in the answer is not well founded.*—93 U. S. 335–337; 1 Sto. Eq. 391; 17 Gratt. 160; 32 Am. St. R. 784; 79 N. Y. 514; 10 N. Y. 406; 31 Ind. 5; 6 John. Ch'y 166; 99 Ind. 175; 12 Col. 46 (13 Am. St. R. 204); 2 Pom. Eq. § 807, 811, 812; 10 Am. St. R. 307; 14 Am. St. R. 538; Big. Estop. (4th Ed.) 575; 35 W. Va. 578; 1 Sto. Eq. Juris. § 391; 17 Gratt. 160; 145 Ill. 559; 69 Miss. 403; 64 Vt. 522; 12 So. Rep. 427; 49 N. W. Rep. 205; 18 Atl. Rep. 444; 1 Gill. (Md.) 502; 5 Cent. Rep. 580–583; 20 Pick. 186; 11 Ohio State 42; 7 Barr 233; 4 Harris (Pa.) 357; 7 Cas. 331–337; 8 Conn. 554; 25 Vt. 273; 2 De G. & J. 136–141; 2 Sto. Eq. Juris. § 1543; 29 W. Va. 336; 41 N. W. Rep. 453; Big. Estop. (4th Ed.) 575; 39 Ark. 131; 29 Kan. 28; 36 Fed. Rep. 138; 4 Munf. 332.

11.—*The sisters and the children of the deceased sisters of Mrs. Williamson have a vested remainder in the seven tenths of*

*the land in controversy, and the rents, issues and profits thereof.*—1 Lom. Dig. 409–418; 2 Lom. Dig. 152; 83 Ky. 481 (4 Am. St. R. 160); 4 Kent. Com. 206; 2 Red. Wills 225–231; 4 Pet. 1.

12.—*Mrs. Williamson has a life-estate only, with no power to sell or dispose of the seven tenths of the land devised to her by her father, except she has the power of appointment by will.* —86 Va. 876-880; 3 Lom. Dig. 216; 84 Va. 880; 13 W. Va. 511, Syll. 7, p. 565; 35 W. Va. 524; 82 Va. 588; 78 Va. 197; 10 East. 438; 4 Call. 477; 18 Gratt. 541; 2 Lom. Dig. 171; 2 Min. Inst. 821, 823; 11 Gratt. 466; 2 Gratt. 1; 6 Mun. 352.

13.—*Mrs. Williamson, as tenant for life, could not produce any oil, or oil wells on the property devised to her for life. Doing so is waste. And the alienee of the tenant for life could not do any more in this respect than the life-tenant.*—2 Min. Inst. 127; 2 P. Wms. 388; 1 Rand 258.

14.—*The tenant for life, or those claiming under her, will be enjoined from committing waste, where a single, clear instance of waste is shown to have been committed.*—3 Sand. Ch'y 601; High Inj. §§ 686, 687; 33 Mich. 193; 31 W. Va. 621, 632; Sto. Eq. Pl. (10th Ed.) § 279a; 1 Dan. Ch'y Pl. 227, 228; Eden Inj. 163; 1 Johns Ch'y 11: 2 Dan. Ch'y 1629–1631; 31 W. Va. 621; 6 Mun. 134; 31 Pa. St. 44; 24 Pa. St. 162; 41 Pa. St. 357; 10 Gratt. 386; 4 Kent. Com. 75–80, and notes by Holmes; 11 Gray 123; 3 Wend. 104; 113 U. S. 337.

15.—*Purchaser at void judicial sale.*—37 W. Va. 639; 18 S. E. Rep. 561.

16.— *When decree is void.*—18 S. E. Rep. 468.

HOLT, JUDGE:

These two appeals are both to interlocutory orders entered in one case by the Circuit Court of Tyler county—the one overruling defendant's motion to dissolve an injunction which had been awarded against him, enjoining him from pumping and removing petroleum from the land in controversy; the other appointing special receivers to take charge of the property. But the appeal and supersedeas to the order of injunction of July 13, 1893, was dismissed

in this Court by the appellant. Sixteen grounds of error are assigned, but there is no reason for considering them separately. Some of them relate to important questions of practice, but are not grounds for reversing the orders complained of. The case has not reached a final hearing on the merits; nor is any evidence in, except such as is documentary, and some *ex parte* affidavits. Still, in this immature state of the case, the important questions for decision must arise out of the facts, as in all other cases, and these are to be gathered from the record as it now stands; but, as far as may be, they will be understood to be taken provisionally.

The facts thus ascertained from the pleadings and evidence, as far as may be necessary for the present purpose, are as follows:

David Hickman, of Tyler county, W. Va., the father or grandfather of the principal plaintiffs below, died in the year 1863, leaving his last will and testament, which was duly proved, and admitted to record in Tyler county. The seventh clause—the only one bearing on this controversy—is as follows: "I give and bequeath to my daughter Eliza Williamson, the wife of Dr. William S. Williamson, for life, the shares I own in the Thomas Jones land, adjoining Sistersville, * * * with the power to her to dispose of the same by will amongst her sisters or sister's children, as she may think proper, and, in the event of her death without a will, the said shares * * * shall revert to her sisters in equal proportions." By the eighth clause he gives to his daughter Eliza Williamson a legacy of four hundred dollars, and he appointed Mrs. Williamson and Christian Engle the executors. The latter alone qualified. By a codicil he so modified the seventh clause as to constitute Christian Engle trustee, to whom he devised said lands (including also one hundred acres not in any way here involved) for the sole use of his said daughter for life, but the devise in all other respects to remain as provided for in the seventh clause.

The history of the shares in the Thomas Jones land thus owned and devised for life to his daughter by David Hickman is, so far as it is necessary for our purpose, as

follows: Robert Greer and wife by deed dated 21st April, 1832, conveyed to Thomas Jones a tract of about two hundred and five acres, which is here called the tract of "one hundred and sixty five acres," treated for this purpose as including the adjoining tract of fifty four poles. Between the defendant in this suit, Joseph T. Jones, and the family of Thomas Jones, the former owner of the land, no relationship existed or appears. It is a mere coincidence of names, without bearing or significance. In the year 1849 (about the 22d day of February) Thomas Jones departed this life intestate, seized and possessed of the tracts of one hundred and sixty five acres and of fifty four poles, then regarded as of little value, now in the center of what is called and known as the "Sistersville Oil Field," with twenty six producing wells on this tract, put down and operated by defendant Joseph T. Jones, claiming the same by purchase as hereafter mentioned. Thomas Jones left surviving him as his heirs at law ten children—six sons, namely, Lewis, John H., Thomas, David, Joel, and Milton; and four daughters, namely, Martha, Sarah, Elizabeth, and Emeline. This land was not partitioned among the Jones heirs. Lewis Jones had bought the interest of John H. Jones, Thomas Jones, and Emeline Jones, and also claimed to be the owner of the undivided share of his brother David Jones. David Hickman was indorser for Lewis Jones on a negotiable note, which Hickman had to pay; and Lewis Jones, to secure the payment thereof, by trust-deed dated December 15, 1853, conveyed to R. Hickman and Thomas J. Stealey, trustees, these five undivided shares. On the 12th of March, 1855, the trustees sold four of these interests to David Hickman, the trust-creditor, and conveyed the same to him by deed of that date which was admitted to record in May, 1855. The trustees did not sell the David Jones interest, as it had been previously sold and conveyed under a decree to John Wharry. In September, 1854, Milton Jones conveyed his share to Absolom George. Martha Jones had married John Massey. On the 25th day of March, 1861, Martha Massey and John her husband, Absolom George, and John Wharry sold and conveyed these

three undivided shares to David Hickman. This deed was recorded on the 25th day of April, 1861.

Thus it appears that at the time of his death, in 1863, David Hickman owned seven undivided tenth parts of the Thomas Jones land. These are the shares mentioned in the seventh clause of his will.

On the 1st day of July, 1857, the administrators of James Peden, deceased, instituted a suit in equity in the Circuit Court of Tyler county against Lewis Jones, curator of the estate of Thomas Jones, deceased, and the children and other heirs at law of Thomas Jones, deceased, on a claim for forty one dollars and nine cents. On —— day of February, 1859, Joshua Russell, instituted a suit in equity against the curator of the estate and the heirs at law of Thomas Jones to enforce payment of the balance of thirty two dollars and sixty three cents, due on a note from decedent to Russell. On the 23d day of September, 1862, these two suits were consolidated, and a sale was decreed of the tract of land of one hundred and sixty five acres and the tract of fifty four poles to pay these debts, which had been proved before, and on July 23, 1862, been reported by the commissioner to whom the cause had been referred, viz. to Joshua Russell, fifty one dollars and ninety four cents, amounting to ninety nine dollars and sixty one cents; to Peden's administrator eighty three dollars and ten cents, amounting to one hundred and thirty dollars and twenty one cents; Samuel Davis, thirty five dollars and seventy cents. A. D. Soper was appointed special commissioner to make the sale. None of these claims were liens on any of the interests bought by David Hickman, or affected them in any way, they having been sold and conveyed to him and his vendors before either of these suits was brought; but he was a *pendente lite* purchaser of the one tenth which was sold and conveyed to him by Martha Massey (nee Jones) and her husband by deed of March 25, 1861. David Hickman was not a party to the suit. He was a *bona fide* purchaser for value, or grantee of such purchaser, as to six tenths, with his deeds duly entered of record before the institution of the suits. He was a *pendente*

*lite* purchaser as to one tenth. Soper, the commissioner to sell, died, and this decree remained unexecuted. On the 10th day of June, 1864, Peden's administrators, by James M. Stephenson, their attorney, assigned their decree to the estate of David Hickman, and the two other creditors by decree also assigned their decrees. The three are alike, and one will show for all. The one from Peden's administrators reads as follows:

"Exhibit C. John O. Peden and David Peden, Adm'rs of James Peden, dec'd, *vs.* Lewis Jones, Curator of the Estate of Thomas Jones, dec'd, and Daniel Reynolds. In Chancery in the Circuit Court of Tyler County.

| | |
|---|---|
| A decree at the September term, 1892, in favor of the complainant against defendant for ..................................$41 | 09 |
| Interest thereon from the 26th day of August, 1848, to the 10th day of June, 1864.................................... ..................... 39 | 03 |
| Costs at law ................. ............................................... 7 | 50 |
| Costs in chancery .................................... ......................... 42 | 59 |
| $130 | 21 |

"June 10th, 1864. Received from Christian Engle, executor of David Hickman, deceased, one hundred and thirty dollars and twenty one cents, the debt, interest and costs, above stated; and the benefit of the decree aforesaid is hereby transferred to the estate of the said Hickman, the executor being authorized to enforce the said decree for the benefit of the said estate in any manner he may think proper, but without costs to the complainants. J. M. Stephenson, Attorney for plaintiffs."

On the 10th day of October, 1868, the court entered in the cause the following decree:

"And at another day, to wit, at a Circuit Court held for the said county of Tyler, on the 10th day of October in the year 1868, in the above-named causes, one in favor of Joshua Russell for fifty one dollars and ninety four cents and interest, and one in favor of the administrators of James Peden for eighty three dollars and ten cents, and interest, and thirty five dollars and seventy five cents to Samuel Davis, has been assigned to and paid by the executor of David Hickman since the date of the decree; and it also appearing by the said decree that two tracts of land owned by Thomas Jones, deceased, were decreed to be sold

for the payment of the said debts, unless otherwise paid, and it also appearing that the said David Hickman, at his death was the owner of seven undivided tenth parts of said land, and the executor of said Hickman not desiring the sale of the parts of said land owned by the said estate, but only that part of said land not owned by the estate of said David Hickman, deceased.—It is therefore adjudged and decreed that the commissioner heretofore appointed to make sale of said lands sell the outstanding interests in order to the payment of their portion of the debts aforesaid, the said debts being the debts of Thomas Jones, deceased, and a lien on the whole of said land."

From October, 1868, to December 26, 1881, no orders were entered in these two consolidated causes save orders of continuance. In the meantime Eliza Williamson purchased the outstanding one tenth, being the share of Joel Jones, from his children, who conveyed the same to her by deed dated the 19th day of January, 1870, and on the 6th day of December, 1872, she bought from the children of Elizabeth Kester, deceased (nee Jones), her one tenth share, which was conveyed to her by deed of the last-named date; and on the —— day of December, 1887, she bought at a tax sale the remaining out-tanding share in the name of Thomas Jones's estate, which the clerk of the County Court conveyed to her by deed dated April 1, 1890.

On the —— day of ——, 1886, Eliza Williamson, who had become *sui juris* by the death of her husband, brought a suit in equity against C. Engle as executor and trustee under the will of David Hickman, asking for the will to be executed by, among other things, directing her legacy of four hundred dollars to be paid to her, and that the trusts be carried out in regard to the Thomas Jones land, *etc.* On the 13th day of October, 1886, defendant Engle filed his answer, which resulted in the entry of the final decree in the cause, to wit:

"At a Circuit Court continued and held for the county of Pleasants, at the court house thereof, on the 13th day of October, 1886, the following decree was entered: 'Eliza Williamson, Complainant *v.* C. Engle, Trustee, &c., and Others, Defendants. In Chancery. This day came the

defendant, Christian Engle, trustee for Eliza Williamson, and executor of David Hickman, deceased, and tendered in open court his separate answer to complainant's bill, together with Exhibits A, and B, C, D, E and F, to said answer, and asked that the same be filed; which is accordingly done, whereupon the complainant, by her counsel, agrees to abide by and perform the arrangement and agreement entered into between herself and Christian Engle as executor of David Hickman, deceased, in relation to the liens against the Thomas Jones lands, as alleged and shown by the answer of said Christian Engle, and the exhibits therewith filed in this cause, and to accept the said liens against said Jones land, which are mentioned and fully recited in said answer of said Engle, and the exhibits D, E and F, therewith filed, and amounting on the 25th day of June, 1864, in all to the sum of two hundred and sixty five dollars and fifty two cents, with interest thereon from said 25th day of June, 1864, in full of the balance of two hundred and sixty five dollars and fifty two cents (and the interest thereon accrued and accruing from June 25, 1864) of the bequest of four hundred dollars to her by her father, David Hickman, deceased, which she alleges in her bill to be due to her on account of said bequest; and that said Thomas Jones lands may be sold in the chancery suits of Peden's administrators and Joshua Russell, pending in the Circuit Court of Tyler County, under the decree of sale made therein as stated in said answer of said Engle, for the payment of said liens and the interest thereon accrued and accruing. And the complainant further agrees that this cause be dismissed at her cost, but no docket fee to be taxed therein. To which proposition and agreement by the complainant the defendant, C. Engle, by his counsel accedes and agrees. It is therefore ordered that the foregoing agreement of complainant and defendant C. Engle, executor, *etc.*, be entered up as the decree of this court in this cause; that said Jones land be sold under the decree in said two chancery suits in Tyler Circuit Court for the payment of said liens and interest thereon for the use and benefit of said Eliza Williamson as aforesaid; and that this cause be, and the same is hereby, dismissed at the cost of

complainant, Eliza Williamson, less the docket fee as afore-said. D. D. Johnson, Attorney for Complainant. B. Engle, Attorney for Defendant Engle, Trustee, *etc.*"

"A copy from the minutes.

"Attest: J. L. KNIGHT,

"Clerk Circuit Court, Pleasants Co., W. Va."

On the 26th day of December, 1881, in the cause of Peden's Administrator, *etc. v.* Lewis Jones, Curator of the estate of Thomas Jones, Deceased, *etc.*, C. Engle, executor of David Hickman, and Eliza Williamson, by Ben. Engle, her attorney, filed their petition, giving a history of the case, the assignments of the sums decreed therein, a history of the Jones land, the disposition of the seven tenths by David Hickman, the testator, Eliza Williamson's purchase of two of the three outstanding tenths; that since the death of her husband the land had been of no profit, but a burden to her. They pray that they may be made parties defendant in the Peden suit; that the Thomas Jones land may be sold for the payment of the liens so held by Engle, executor, *etc.*, to pay Eliza Williamson the amount she is entitled to by reason of the interest held by her in said lands in her own right; that the decree of September 23, 1862, and of October, 1868, may be set aside, and a decree entered appointing a new commissioner to make sale of the lands on such terms as the court may deem most advantageous to the parties in interest, to Eliza Williamson as devisee and as owner in her own right, *etc.* Thereupon the court, without making any new parties, entered the following decree:

"And at another day, to wit, at a Circuit Court held for the said county of Tyler, on the 26th day of December in the year 1881: Joshua Russell, Complainant *v.* Lewis Jones, Curator of the estate of Thomas Jones, Deceased, and Others. In Chancery. John O. Peden *et al*, Adm'rs of James Peden, Deceased, Complainants *v.* Lewis Jones, Curator of the Estate of Thomas Jones, Deceased, and Daniel Reynolds, Defendants. In Chancery. This day Christian Engle, executor of the last will and testament, with the codicils thereto annexed, of David Hickman, deceased, and Eliza Williamson, in her own right, presented their joint petition in writing in open court, praying to be made par-

ties defendants to the above two causes, which were, by an order of this court made therein at the September term thereof in 1862, consolidated and heard together, which petition is now ordered to be filed, which is accordingly done. And this cause came on again this 26th day of December, 1881, to be further heard upon the bill, proceedings, orders, and decrees formerly had and made herein, and the said petition of C. Engle and Eliza Williamson, filed as aforesaid, and was argued by counsel for said petitioners. And it appearing to the court that the land owned and held by Thomas Jones, deceased, in his lifetime, in fee simple, consisting of two tracts—one of one hundred and sixty five acres, particularly described in the deed from Robert Grier and wife to said Thomas Jones, a copy of which is filed as Exhibit A, and made part of said petition ; and the other tract containing fifty four (54) poles, more particularly described in a deed from Samuel Corbitt and wife to Thomas Jones, a copy of which is also filed as Exhibit B to said petition—was subject to and decreed to be sold to pay certain liens in said causes set forth, in which order and decree A. D. Soper was appointed to make sale of said lands, who departed this life without having executed said order of sale. And it appearing also from said petition that C. Engle, executor of David Hickman, deceased, holds said liens as set forth in said causes, in favor of Joshua Russell and Peden, administrators, together with a lien in favor of Samuel Davis, amounting to the sum of thirty five dollars and seventy cents, by assignment thereof, and that as trustee under the will of said David Hickman, deceased, he holds seven undivided shares or interests of one tenth each in said land, and that Eliza Williamson holds in her own right two undivided shares or interests of one tenth each in said land ; and it also appearing that said lands can not well be partitioned, and that the interest of the parties will be promoted by a sale of the entire two tracts in one body ; and it also further appearing to the court that the interests held by C. Engle, as trustee as aforessid, are for the use and benefit for life of said Eliza Williamson, by virture of a provision in the will and codicils, thereto of the said David Hickman, deceased. It is therefore adjudged, ordered, and

decreed that Benjamin Engle be and is hereby appointed a special commissioner to make sale of said land, as particularly described in Exhibits A and B, filed with said petition in the bill and proceedings of, and the decrees and orders heretofore made in, said two causes, who is hereby directed to give notice by publication in some one or more newpapers published in Tyler county for four consecutive weeks of the time, terms, and place of sale, which shall be made at the front door of the court-house of Tyler county, on some court-day upon the following terms, to wit: One third of the purchase-money to be paid cash in hand, and the residue thereof to be paid in three equal instalments, to be become due and payable respectively in eight, sixteen and twenty four months from the day of sale, with legal interest, to be paid semiannually, on each day and all of said deferred payments from the day of sale. And said commissioner is hereby directed to require the purchaser to give bonds with approved security for said deferred payments, to become due and payable as aforesaid, with interest to be paid semiannually, as hereinbefore provided; and the said commissioner is hereby further directed to retain a lien upon the said real estate to secure the payment of the deferred instalments of purchase-money therefor, and the interest thereon; and said commissioner will report his proceedings under this order to this court at a future term thereof."

On the 14th day of April, 1882, the court modified the decree of December 26, 1881, authorizing and empowering the commissioner, Benjamin Engle, to sell the undivided seven tenths interests held by C. Engle as trustee under the will of David Hickman, and the undivided two tenths then held by Eliza Williamson in her own right in said real estate, either at public auction or at private sale, and may sell said seven tenths and two tenths together; and the undivided one tenth interest in said two tracts yet outstanding is to be sold at public auction, but in all other respects the commissioner is to be governed by the terms and conditions of former decrees of sale. No bond was required by these decrees to be executed by Commissioner Engle before acting, but he gave and filed a bond in the penalty

of two thousand dollars on March 15, 1890, conditioned according to law.

The causes were continued from time to time until the decree of December 12, 1891, confirming the sale. On that day Commissioner B. Engle returned and caused to be filed his report of sale. He reports that on the 10th day of December, 1891, in front of the court house door of Tyler county, in pursuance of the decrees of sale, he sold at public auction the two tracts of land in the bill and proceedings mentioned; that J. C. Tennent, being the highest and best bidder, became the purchaser thereof at the price of four thousand dollars—two thousand dollars paid cash in hand, and three bonds for six hundred and sixty six dollars and sixty six and two thirds cents each, interest from date, payable semi-annually, and due in eight, sixteen and twenty four months, without personal security, but a lien retained on the land. This sale, there being no objection thereto, was confirmed by decree of December 12, 1891.

Out of the cash payment the commissioner was decreed and directed to pay to C. Engle, executor of the last will and testament of David Hickman, deceased, the sum of two hundred and sixty five dollars and fifty two cents, the amount of charges or liens held by him as such executor, with interest on said sum from the 26th day of June, 1864, to December 12, 1891; to pay three tenths of the residue to Eliza Williamson and the remaining seven tenths to Christian Engle, trustee under the will, to be by him invested at interest for the benefit of Eliza Williamson for life; that the commissioner, after having first given bond with security in the penalty of two thousand dollars, withdraw and collect the sale-bonds as they fall due, and pay proceeds as directed above. And he was directed to execute and deliver a deed to the purchaser, retaining a lien for the deferred instalment. On motion of the purchaser he had leave to sue out a writ of possession. Up to that time Mrs. Williamson held the land in possession. Before receiving any money under the decree, Christian Engle, as trustee, was required to execute and file in the papers a bond in the penalty of two thousand five hundred dollars, with good security, conditioned according to law, and the causes were ordered to be dropped from the docket.

Benjamin Engle, as commissioner, conveyed the lands to Tennent, the purchaser, by deed dated the 4th day of February, 1892, retaining a vendor's lien for the deferred instalments, which have since been paid. In making this purchase James C. Tennent acted as the agent of defendant Joseph T. Jones, who paid all the purchase-money, and to whom Tennent conveyed the land by deed dated 8th February, 1892. Defendant Jones took possession, bored twenty three fine producing oil wells, at a cost of about six thousand dollars each. He produced from June, 1892, when the first well was completed, until September 21, 1893, about four hundred and three thousand six hundred and eighty one barrels of oil; received for oil sold during that time about one hundred and eighty nine thousand five hundred and eighty dollars and ninety cents, and that drilling and operating had been at a cost of about two hundred and twenty five thousand dollars.

David Hickman left six daughters, who were entitled to take under the seventh clause of his will: (1) The plaintiff, Eliza Williamson, whose husband, Dr. Williamson, has died since the death of David Hickman. (2) Laura Weirich, who died in 1868, without issue surviving her, leaving a will in which she gave to her sister Mary Hickman a part, and to her husband, Dr. Israel Weirich, the residue of her interest in her father's estate, and appointed her brother, David Hickman, her executor. Dr. Weirich died intestate in 1887, without issue, *etc.* (3) Caroline Stealey, who died in 1880, intestate, leaving as her children and heirs at law David H., Nancy Engle, wife of Benjamin Engle, Kate, Eliza and Nellie, the last being under twenty one years of age. (4) Mary Hickman intermarried with William Arthurs, and in 1890 died, leaving three infant children her heirs at law, viz., Mary, John, and David. (5) Mercy P. Wells is living; also (6) Rosalie Stealey. Eliza Williamson conveyed her interest to William H. Gillespie by deed dated 22d June, 1893. Mrs. Wells and husband sold and conveyed her interest to W. H. Gillespie by deed dated June 28, 1893, and Rosalie Stealey sold and conveyed her interest to Gillespie, whatever such interest may be, and Gillespie qualified as guardian of the infant children of Mary Arthurs.

The bill of injunction was brought on July 13, 1893, by Eliza Williamson and W. H. Gillespie, assignee of Eliza Williamson; Mary P. Wells, and Rosalie Stealey and Gillespie as their assignee; David Arthurs, May Arthurs, and John Arthurs, infants, by Gillespie, their next friend; David H. Stealey, Eliza Stealey, Kate Stealey, and Nellie Stealey, the latter a minor, by Thomas J. Stealey, her next friend, plaintiffs, against Joseph T. Jones, J. C. Tennent, Nannie Engle, Christian Engle, executor of the last will and testament of David Hickman, deceased, and Christian Engle, as trustee under said will; the Eureka Pipe-Line Company, a corporation created by the laws of West Virginia, and the W. L. Melton, Pipe Lines, a corporation created by the laws of the state of Pennsylvania—and charges in substance that defendant Joseph T. Jones has no valid title to these oil lands; that it was the property of defendants; that they were committing irreparable injury to and waste of the inheritance in cutting and removing the standing timber, and taking the petroleum or mineral oil, which constituted its chief value.

The plaintiffs pray that the defendants answer fully; that they may be required to file an account showing the amount of oil taken, sold and removed from the premises; that an account thereof may be taken before one of the commissioners of the court; that the deed from Engle, commissioner to Tennent, and from Tennent to J. T. Jones, may be set aside; that the court will direct the payment of the rents, issues and profits due Eliza Williamson to be made to her, and her interest to William H. Gillespie, *etc.;* that the court will enjoin and restrain the defendants from further operating for oil or producing the same or removing the same or selling it, *etc.*, and for general relief.

The injunction was granted without notice restraining the pipe-line companies from paying over or delivering to defendant J. T. Jones and J. C. Tennent, or either of them, any of the proceeds of the sales of oil produced from the Jones tract of one hundred and sixty five acres, *etc.*, until further order.

On motion, on notice, two special receivers were appointed on the 25th day of August, 1893. On the 25th day

of September, 1893, plaintiffs filed notice of motion for order of reference, and defendant Joseph T. Jones filed two notices—one of motion to dissolve the injunction, the other to increase the penalty of the injunction-bond—and the time for hearing these three motions was fixed for the 17th of October; and on first Monday in October, 1893, defendant Jones filed his demurrer, also his separate answer, duly sworn to, to complainant's bill, and certain exhibits. The Eureka Pipe-Line Company filed their answer on the 17th day of October, 1893, exhibiting the state of defendant Jones's oil and oil account from wells on the Jones land. On the 14th day of November, 1893, the judge entered the following order :

"Eliza Williamson *et al v.* Joseph T. Jones and Others. In Chancery.

"This 17th day of October, 1893, at Ritchie Courthouse, W. Va., before the judge of the Circuit Court of Tyler county, came the parties by their attorneys, and the motion of the plaintiffs for an order of reference herein was heard upon the duly-certified copy of the will of Laura Weirich, deceased, and the answer of the defendant Joseph T. Jones, which was filed at October rules, 1893, in the Tyler county Circuit Court clerk's office (to which the plaintiffs replied generally) the affidavits of Fannie E. Anderson, J. S. Pierpont, A. H. Ong, and F. D. Young, and two affidavits of J. B. Thomas (to the consideration of which affidavits the plaintiffs objected) upon the demurrer of said Jones herein, and upon all the affidavits, pleadings and papers heretofore read ; and said motion was argued by counsel, and taken under advisement by the judge. Thereupon the motion of the said defendant Joseph T. Jones for a dissolution of the injunction herein, and also his motion for the court to require an increase of the amount of injunction-bond in the event that the court refused to dissolve the injunction, were heard upon said affidavits read at the hearing of the motion for the appointment of a special receiver herein (to the reading and consideration of said affidavits the plaintiffs excepted) and upon the other papers and pleadings then read, the said answer and replication thereto, the affidavit of J. T. Jones of October 16, 1892, and the

affidavit of John A. Taylor (to which two last-named affidavits the plaintiffs objected); and said motions of said Jones were argued by counsel, and taken under advisement by the judge. And now at this day, to wit, on the 14th day of November, 1893, the undersigned being fully advised as to what order and decree to make herein, it is adjudged, ordered, decreed and pronounced that the motion of complainants to refer this cause to a commissioner at this time be and the same is hereby overruled. And as to the motions of the defendant J. T. Jones to dissolve wholly the injunction heretofore granted herein, and in case that should be refused, then to dissolve said injunction as to three tenths of the land in dispute, the court doth overrule said motions and each of them; the court being of opinion not to read on the hearings of said motions *ex parte* affidavits taken without notice, where objections are made to the reading thereof. And as to the motion of J. T. Jones to require from the plaintiffs an increase in the amount of the injunction-bond, it seems to the court that said motion ought to be sustained. Therefore it is ordered and decreed that the complainants, or some of them, or some one for them, do within a reasonable time execute before the clerk of the Circuit Court of Tyler county, West Virginia, an additional injunction-bond herein in the penalty of twelve thousand dollars, with security to be approved by said clerk, conditioned as the law directs in such cases."

We are met at the threshold by the contention on the part of defendant Jones that, no matter who may be the rightful owner of the land, petroleum—mineral oil—so far from being a part of the inheritance, something of which waste can be committed, is only capable of the qualified ownership of belonging to him who first appropriates it, no matter where it may be situated. Whatever the earlier decisions in other states may have been, it has never been so held in this state; and the authorities now very generally —universally, as far as I have examined them—hold petroleum to be a mineral, and as much a part of the realty as timber, coal, or iron ore, except that in proper cases its mobility as a subterranean liquid must be taken into con-

sideration, as in the case of salt water, *etc.* The courts of the state of Pennsylvania have had many cases, some involving property rights of great value, in which the point arose, and have examined the question thoroughly, considered it with great care with reference to its being property where it is found, and its character and nature as property in general.

"Oil is a mineral, and, being a mineral, is part of the realty. *Frank* v. *Haldeman*, (1866) 53 Pa. St. 229, 249. In this it is like coal or any other natural product which in *situ* forms part of the land. It may become, by severance, personalty, or there may be a right to use or take it, originating in custom or prescription; as the right of a life-tenant to work open mines, or to use timber for repairing buildings or fences on a farm, or for firebote. Nevertheless, whenever conveyance is made of it, whether that conveyance be called a lease or deed, it is, in effect, the grant of a part of the *corpus* of the estate, and not of a mere incorporeal right. Not infrequently the oil forms by far the most valuable part of an estate." *Stoughton's Appeal* (1878) 88 Pa. St. 198, 201; *Gas Co.* v. *De Witt*, 130 Pa. St. 235 (18 Atl. 724); *Hague* v. *Wheeler*, 157 Pa. St. 324 (27 Atl. 714.)

As to ownership *in situ* of subterranean waters, see *Collins* v. *Gas Co.* (1890) 131 Pa. St. 143 (18 Atl. 1012); as to ownership by different ones of the surface, coal, iron ore, oil, gas, *etc.*, see *Coal Co.* v. *Mellon* (1893) 152 Pa. St. 286, 293 (25 Atl. 597); *Wheatley* v. *Baugh*, 25 Pa. St. 528—where there is a full note on the subject. "Where percolating water is found, it belongs to the realty where it is found. *Chasemore* v. *Richards*, 7 H. L. Cas. 349. In *Findlay* v. *Smith* (1818) 6 Munf. 134, subterranean salt water is treated as part of the inheritance of which waste could be committed. And for a like or a stronger reason should rock oil be so regarded. *Hail* v. *Reed*, 15 B. Mon. 479.

I do not understand the case of *Petroleum Co.* v. *Transportation Co.*, 28 W. Va. 210, to lay down a different doctrine, even as to natural gas, so long as it is confined in the strata where it is found. It is only when it escapes out of the possession of the owner that the right of property is gone. This follows as an inevitable result of its fugitive

nature.    In that case the lease was for carbon oil at a fixed royalty, and the gas escaped with it, and thus ceased to be a part of the realty, and this was shown to be a natural and inevitable incident to the sinking of all oil wells in that region, as verified by an experience of twenty years; and, while the grant was for the specific purpose of mining and removing carbon oil, still the lease necessarily included the gas which came up with the oil as an inevitable concomitant; that it was essential that the well should be kept open in order to pump the oil, and the gas necessarily, from its nature, and by its own force, issued from it.    And the court held, under the circumstances of that case, that the lessee could, in any proper manner that he might choose, appropriate and use this escaped, wild gas without accounting therefor.    As to oil coming up in a salt-well, see *Kier* v. *Peterson* (1861) 41 Pa. St. 357.

In the case in 28 W. Va. 210, cited above, the court evidently regarded the oil as part of the realty, if not the gas also, as long as it remained in the earth, and subject to the owner's control, whether such owner be lessor or lessee; but from its nature the title of such owner is gone when the gas escapes into the land of another, and comes under his control.    See Gould, Waters (2d Ed.) § 291; *Gas Co.* v. *Tyner*, 131 Ind. 277 (31 N. E. Rep. 59); *Id.* 31 Am. St. Rep. 433, and cases cited in the note.    We take for granted, therefore, that petroleum in place, among the strata of the earth, where it belongs, is a part of the inheritance, and to take it unlawfully would be lasting damage to the disherison of him in remainder.

Defendant Joseph T. Jones admits that he has taken the oil from the land in controversy in large quantities; is still taking it, as he claims he has a right to do; and he justifies by setting up his purchase at the judicial sale already set forth.    The plaintiffs claim as life-tenants and tenants in remainder under the will of David Hickman, and that defendant Jones has no title; that he is doing irremediable mischief, going to the destruction of the substance of the estate by the cutting down of the timber and the extraction and sale of the oil.    This is a sufficient ground for injunction, and it is no answer to say that the title to the

premises is in litigation. See *Ehardt* v. *Boaro*, 113 U. S. 539 (5 Sup. Ct. 565). If an action of ejectment were pending to recover possession of the land in controversy, the court, under such circumstances, could require the sheriff or other officer to take possession of the land. See Code, c. 92, s. 5. So an injunction may be awarded to protect any plaintiff in a suit for specific property, pending either at law or in equity, against injury from the sale, removal, or concealment of such property. Code, c. 133, s. 1. This, in a proper case, leads to the appointment of a receiver, or managing receiver, as was attempted in this case. Here the bill alleges waste, spoliation of the inheritance, by severing and selling a part of the *corpus;* prays an injunction against future waste, and an account and satisfaction for that already committed. So that the main question is, what title to the land in controversy did defendants Tennent and Jones get by virtue of the purchase at the judicial sale? And while the title to this property with twenty three producing oil wells on it was being litigated, it was eminently proper for a court of equity to take hold of it in a proper way, hereinafter indicated.

I take for granted that under the will of David Hickman the plaintiff Eliza Williamson took a life-estate in the undivided seven tenths of the land in controversy, and her sisters and her sister's children (representing as a class a deceased sister) at the death of the testator the remainder in fee, and that such remainder was not contingent, but vested; for "it is not the uncertainty of ever taking effect in possession that makes the remainder contingent, for to that every remainder for life (or in tail) is and must be liable, as the remainder-men may die, or die without issue, before the death of the tenant for life. The present capacity of taking effect in possession, if the possession were to become vacant, and not the certainty that the possession will become vacant before the estate limited in remainder determines, universally distinguishes a vested remainder from one that is contingent." Fearne, Rem. (Butler's Ed.) 215, 216. "It is now clearly settled, after considerable doubt and hesitation, that the existence of a power of appointment will not prevent estates limited to take effect in

default of the exercise of the power from vesting, if they are such as, apart from the existence of the power, would be vested estates." Challis, real Prop. 57; Fearne, Rem. p. 225, § 9. "Such estates are said to be vested, but liable to be divested by an exercise of the power." See Tied. Real Prop. § 397, and under section 401 and notes, page 401, and note 2, page 389.

By the Code of West Virginia (see chapter 71) any estate may be made to commence in future by deed, in like manner as by will. No words of limitation are now necessary to create or pass a fee simple. Fee tails may still be created, but they are docked by the statute, and converted into estates in fee simple. But the word "heirs" is still constantly used as a word of limitation. But if the estate is given by deed or will to any one for life expressly, and after his death to his heirs or heirs of his body, the conveyance is construed to vest an estate for life only in such person and a remainder in fee simple in his heirs or the heirs of his body. A contingent remainder can no longer fail for want of a particular estate to support it, and the alienation of the particular estate, or the union of such estate with the inheritance by purchase or descent, no longer operates by merger or otherwise to defeat, impair, or otherwise affect such contingent remainder, so that trustees to preserve contingent remainders are no longer in any contingency necessary, as it can not be destroyed by forfeiture, surrender, merger, or wrongful alienation; but it may be sold by proceeding in equity under the statute. See Code (Ed. 1891) p. 635, c. 71, s. 20 *et seq.* The suit is in the name of the owner of the particular estate, but all persons then living who are contingently interested, must be made parties defendant in person. Such living persons can not be made parties by representation.

Were the debts decreed in the chancery suits of Peden and Russell, under which the land was sold, extinguished by the payment made by and assignment made to Christian Engle as executor?

It is contended that it was the duty of the executor to pay off these decrees, because the first clause of the will reads as follows: "I desire that, as soon after my death as

possible, that all my debts be paid by my executor, both legal and equitable, including all, if any there are, that I might be in honor bound to pay." I do not regard the Peden and Russell decrees against the estate of John Jones as properly falling within the debts thus mentioned, for they were not debts for which the testator was in any sense liable as principal or surety, in law or in equity; and the payment thereof as his debt could not have been contemplated or intended by him. Still the payment was made by the executor with the funds of the estate, and the assignment was taken to him as executor, for the evident purpose of removing a cloud from the title to this one hundred and sixty five acres, seven tenths of which had been devised by the testator. The decree was for the sale of the whole tract, and such a sale to a stranger would have at least clouded the title of these devisees; and, although Hickman was not a party to the suit, a sale under the decree might have had, in ways that need not be considered, the effect of embarrassing, if not defeating, the title to a part or all of the seven tenths interest of the testator. The assignment was evidently taken in the interest of the devisees, and for their protection and benefit, as far as was necessary, as he was their trustee under the will, as well as the executor; and, as far as necessary, would be construed as inuring to their benefit. But it did not *ipso facto* operate as an extinguishment of the incumbrances. There were obvious reasons why it should be kept alive, for it was a lien on the three tenths undivided, which the testator did not own or claim; and, as a practicable way out of the trouble, it might have been prudent to have enforced the decree by a sale of the land, but for some good reason no doubt the executor saw fit to pursue a different course.

It is claimed by plaintiffs that the attorneys at law had no right or authority to make these assignments. It is true, no authority expressly appears, but they were made nearly thirty years ago, and are now to be taken as adopted and ratified by the receipt of the money paid by the executor. However that may be, they set up no claim, and strangers can not now do so for a wholly foreign purpose.

On the 10th day of October, 1868, the executor had the

decree of that date entered, whereby he made it appear to the satisfaction of the court that as executor of Hickman he had paid and taken an assignment of the sums decreed against the land by decree of September 23, 1862, and for the payment of which it had been decreed to be sold, unless otherwise paid; that David Hickman, his testator at his death was the owner of seven undivided tenth parts of said land; that he, the executor, did not desire a sale of the parts of said land owned by the estate of David Hickman, deceased. After this recital the court adjudged and decreed that the commissioner hereinbefore appointed to make sale of said lands sell the outstanding interests, in order to pay their portion of the debts aforesaid, being the debts of Thomas Jones, deceased, and a lien on the whole of said land.

What was the effect of this decree? Whatever other effect it may have had, there was and is no reason why it should not have had the effect to free the seven tenths from the incumbrance, and withdraw it from the operation of the previous decree of sale, as it was evidently intended to do. Whether it left three tenths of the land called "outstanding" to be sold to pay three tenths of the sums decreed need not be considered, further than to say that that could only be done after giving the defendants, the heirs of Thomas Jones, deceased, who as such were the respective owners of the three tenths, an opportunity in some way to be heard, which was not done in this case.

The next decree was entered on the 26th day of December, 1881, on the petition filed of C. Engle, executor and trustee under the will of David Hickman and Eliza Williamson, by B. Engle, attorney, and this again was modified by the decree of April 14, 1882. It is claimed that these decrees were void, because the decree pronounced on the 23d day of September, 1862, was final; "that the latter is a decree disposing of the whole subject, deciding all questions in controversy, ascertaining the rights of all parties, and awarding the costs" (*Harvey* v. *Branson*, 1 Leigh 108); "that no further action of the court in the cause is necessary to give completely the relief contemplated by the court" (*Cocke* v. *Gilpin*, 1 Rob. [Va.] 20); "nothing further than

those measures or proceedings which are necessary for the execution of the decree which has been pronounced, and which are properly to be regarded as adopted, not in, but beyond, the cause, and as founded on the decree itself or mandate of the court, without respect to the relief to which the party was previously entitled upon the merits of his case." See full discussion of the subject in *Core* v. *Strickler*, 24 W. Va. 689. See, also, *Mower* v. *Fletcher*, 114 U. S. 127 (5 Sup. Ct. 799). It is certainly not a final decree in the sense of putting the cause to an end and the parties out of court, for the land remained to be sold, the sale to be reported and passed upon ; but it would now be an appealable decree, as it requires money to be paid and real estate to be sold. See Code, c. 135, s. 1.

Whatever we may call it, and whatever the power to make it as against the heirs of Thomas Jones, deceased, it was made, appointing the commissioner Soper to sell three tenths of the tract of land. It was still standing unexecuted. The commissioner was dead, and now Mrs. Williamson, a *pendente lite* purchaser of the three tenths, by a writing signed with her name asked the court to appoint a new commissioner, and cause it to be sold, which was done, with her approval, and she received the proceeds of the sale. Having thus made her election, she is estopped ; and although, as matter of law, both she and the purchaser may be taken to have known the proceeding to have been void or voidable, yet, she having once made her choice to treat it as valid, he had a right to take her at her word, and act accordingly. If the matter complained of was wrong, it had its origin with her, and it is now too late for her to take advantage of it.

We have already seen that the sisters of Mrs. Williamson, as a class, took under the will of their father, David Hickman, a vested remainder in the seven tenths of the land in controversy subject to the life-estate of Mrs. Williamson and to her power of appointment among them by her will ; and that the decree as against their interest in the land had been entered of record in the cause as released or discharged, and it was adjudged that no sale thereof should take place. Their interest being vested, not con-

tingent, they could not be made parties to any judicial proceeding by representation. Their sister, the life-tenant, did not so represent them as to their remainder as to bind them. *Baylor* v. *Dejarnette,* 13 Gratt. 164; *Faulkner* v. *Davis,* 18 Gratt. 683. They can be bound only after they have had an opportunity to be heard. They were not parties to the suit nor to the petition filed by Engle, the executor, and Mrs. Williamson. They had no notice thereof and are not bound by any of the proceedings or decrees, under which defendants Tennent and Joseph T. Jones acquired title. All such proceedings as to them were void. They had nothing to do with setting on foot the judicial proceeding which led to the sale. They received none of the purchase-money. They were not in possession as remainder-men. They had nothing to do with delivering the possession to Jones in performance of his contract of purchase; and, as to their standing by and seeing without complaint or protest Jones, the purchaser, expend so large a sum in developing the oil, it is a new fact as to them, alleged in the answer to repel and avoid the equity of their bill; and, even if provable by affidavit taken without notice, and I treat them as in and having read it, it is not made to appear otherwise than as a inference to be drawn from the fact that they were residents of the county; and, if they had known it, Jones, the operator, was their co-owner of the inheritance to the extent of an undivided three tenths part, with the right as tenant of the whole of it during the life of Mrs. Williamson; and therefore he had, as against them, the right to drill wells into the oil-strata of the inheritance, and take his share of the oil, provided always that he does not take more than his share. See MacSwinney on Mines, p. 110, c. 6. But he is not entitled to appropriate more than his share of the product. This refers to his share of the net product after deducting all expenses incident to the working. I should think that a co-owner, who has expended so large a sum, entirely at his own risk, but with the knowledge of the other co-owners, in so hazardous an enterprise as developing oil in an unexplored field, ought not to do more than account to them for their proportion of a customary royalty, proper

and fair under all the circumstances. *Id.* p. 112, and cases.

As to the jurisdiction of a court of equity there can be no question. (1) Because it is, as to seven tenths undivided part, a trust property, vested by the testator in the defendant Christian Engle, trustee, to hold for Mrs. Williamson for life, who is still living, with power to her to dispose of the same by will among her sisters or sister's children, as she may think proper; and, in the event of her death without a will, the said shares to revert to her sisters in equal proportions. How is a court of law, restricted as it still is to such common-law machinery as it has in this state, to take hold of and properly conduct such business? And if the common-law methods have been to some extent advanced and improved, the jurisdiction of courts of equity in such cases has not been superseded or taken away by statute. (2) Because a court of equity, with its power to enjoin waste, appoint receivers and managers, take accounts, *etc.*, is the forum peculiarly appropriate for the remainder-men in such cases; and, if the remainders were in any sense contingent, as they are claimed to be on behalf of the defendant, within the meaning of the rule that permits them to be regarded as parties to a cause by representation; and although a trustee is no longer necessary in any case in this state to preserve contingent remainders, still it was the duty of the trustee in this case and cases like it to see that waste of the inheritance to the disherison of those who might be entitled by way of contingent remainder was restrained, and the waste already committed accounted for, and the property of those ultimately to be entitled was protected and preserved.

But, as to Mrs. Williamson, the case, in my view, is wholly different. She was the owner in fee of the undivided three tenths part, and of the life-estate in the remaining seven tenths. She came into court, by her attorney, as such owner, and as owner of part of the incumbrance, and, with the executor, asked that the land be sold. The decree of sale was pronounced at her instance. The sale was made at a full, fair price—four thousand dollars. In her petition, signed with her name, she set forth that

she was, under the devise from her father, the owner for life of seven tenths and of two tenths in fee; that Christian Engle had power and authority to enforce the decrees for the benefit of David Hickman's estate, praying that a new commissioner be appointed to make sale of the land. As to these facts, showing her interest, thus represented by her, they were material and seem to have been true. The purchaser, we must presume, relied upon the facts stated in the petition, and thereby to that extent was induced to buy. The land seems to have been sold for the purpose, among others, of making partition, and of converting it into money, so that Mrs. Williamson might get the interest for life on seven tenths of the proceeds and three tenths of the proceeds out and out. Having gone thus far, she must have intended that the purchaser should act upon it as a valid sale. The purchasers had no superior knowledge on the subject. The value of the property could only be determined by the drill at great risk, and with great cost and expense. She did not except to the sale, but it was confirmed, and the land conveyed, and possession delivered with her consent. After taking out the sum of two hundred and sixty five dollars and fifty two cents, with interest, three tenths of the residue was directed to be paid to her, and the residue—seven tenths—her trustee was ordered to put at interest for her benefit for life. The cause was ended, and dropped from the docket.

So far as the sale of the interest of Mrs. Williamson is concerned, it matters but little whether the sale be held to be valid or void; and, whether the judicial proceedings be called void or voidable, she is estopped by her conduct from calling it in question, or in any way impeaching its validity—First. By her conduct in inducing such void judicial proceedings to be had, and the sale thereunder to be made; by receiving and keeping the purchase-money; causing her possession to be turned over to the purchaser, and a deed to be made to him purporting to convey to him her interest. Second. By standing by and seeing the purchaser put down twenty three oil wells, at an outlay of about one hundred and forty thousand dollars, without opening her mouth against the validity of his title during

a period of fourteen months, without discovering any new fact except the one the purchaser's drill had brought to light. Now she asks that he be treated as a trespasser and spoliator, and that the property and the oil produced be taken from him, and turned over to her fresh vendee, who seems to have felt some interest in the result of the experiment.

In one of the affidavits read on the hearing of the motion for the appointment of a receiver it is stated that Mrs. Williamson said, among other things, in the course of a conversation, that "she was sorry that the suit had been brought; and I infer from that and other things that her conduct was induced to enable her sisters, as she supposed, to assert their right, rather than for any purpose of her own." But we must, for this purpose, take the facts as they are shown to be by the pleadings and the unquestioned exhibits filed therewith. Mrs. Williamson thus showed that on second thought it would be inequitable for her, as to her own interest, at that stage of the transaction, and under such circumstances, to take advantage of such defect in the purchaser's title; and she expressed her thought in the language of feeling, and in this second thought of hers she stated correctly the equitable doctrine on the subject deciding the case against herself, and, as we may infer, not against her sisters.

A party who causes his land to be sold under a void judicial proceeding for some purpose of his own, and afterwards receives and retains the proceeds of the sale, is not permitted to impeach its validity; and if he afterwards stands by and sees the purchaser expend in good faith large sums in developing oil on the property, he may not then set up such defect in the proceedings. In the one case the court has made the sale as his agent. He has acquiesced and ratified it by causing the possession to be turned over, and the land to be conveyed, and purchase-money to be paid. In the other he has received the proceeds of sale, and stood by and seen large sums expended on the faith of the ownership thus acquired from him. "The principle of estoppel thus applied has its foundation in a wise and salutary policy. It is a means of repose. It

promotes fair dealing. It can not be made an instrument of wrong or oppression, and it often gives triumph to right and justice where nothing else known to our jurisprudence can by its operation secure these ends. Like the statute of limitations, it is a conservator, and without it society could not well go on." *Daniels* v. *Tierney*, 102 U. S. 415, 420; *Galliher* v. *Cadwell*, 145 U. S. 368 (12 Sup. Ct. 873); *Sherman* v. *McKeon*, 38 N. Y. 266; *Ferguson* v. *Landrum*, 5 Bush 230.

The application of the principle does not depend upon any supposed distinction between a void and voidable sale. "The receipt of the money with the knowledge that the purchaser is paying upon the understanding that he is purchasing a good title touches the conscience, and therefore binds the right of the party in the one case as well as in the other." *Smith* v. *Warden*, 19 Pa. St. 429. It starts with the fact of a defect in the purchaser's title, which has led to the course of conduct which creates the estoppel; but it is the nature and effect of the conduct itself which calls for the application of the doctrine. See Freem. Void Jud. Sales (3d Ed.) p. 87, § 50, and cases cited, among them *Spragg* v. *Shriver*, 25 Pa. St. 282; *Maple* v. *Kussart*, 53 Pa. St. 349; *Southard* v. *Perry*, 21 Ia. 488; *Deford* v. *Mercer*, 24 Ia. 118; Bigelow, Estop. (5th Ed.) p. 683, c. 21, § 453 *et seq.*; 2 Herm. Estop. p. 1195; *De Zell* v. *Odell*, 3 Hill 215 (38 Am. Dec. 628, notes).

Mrs. Williamson now claims that her attorney had no authority to sign her name to the petition which was filed praying the court to decree a sale of the land, and that the court had no jurisdiction to pronounce the decree; but, as the case now stands, it must be taken that he did have such authority, for there is no evidence of any kind to the contrary, and the allegation is expressly denied; and, as we have already seen, having accepted the benefits of the decree, she can not now be heard to question the jurisdiction of the court to render it. See *Ellis* v. *White*, 61 Ia. 644 (17 N. W. 28); *Wandling* v. *Straw*, 25 W. Va. 692, 703. And her signing the petition is taken as relieving the case of any question under the statute of frauds, so far as it may be considered as involved; for in this case Mrs.

Williamson, by her petition asking a sale, invested the court with apparent authority to make the sale. When reported as sold, she saw fit to have it confirmed; treated it as a valid sale, causing her actual possession to be turned over to the purchaser, and a deed to be made. The purchaser paid the four thousand dollars purchase-money into court on the faith of such apparent power to sell, thus treated as real. The money was in part paid out to her, and she still retains it. Besides that, she stood by, and saw him expend large sums in the hazardous enterprise of developing oil, which, being successful, increased its value an hundredfold.

As to estoppel *in pais* in regard to land, in view of the statute of frauds, see Bigelow, Estop. (5th Ed.) pp. 712, 665; 2 Beach. Mod. Eq. Jur. § 1113; *Dickerson* v. *Colgrove*, 100 U. S. 578; 2 Herm. Estop. § 1074; 7 Am. & Eng. Enc. Law, p. 22; Browne, Frauds (4th Ed.) 457a; *Trustees, etc.,* v. *Smith*, 118 N. Y. 634 (23 N. E. Rep. 1002). Upon the subject generally, see the following English cases : *Pickard* v. *Sears*, 6 Adol. & E. 469; *Cairncross* v. *Lorimer*, 3 Macq. 829; *Carr* v. *Railway Co.*, L. R. 10 C. P., 307; *Duchess of Kingston's Case* (9th Am. from 9th Eng. Ed.) 3 Smith, Lead. Cas. 1998.

There remains to be considered a question of practice, which, owing to its liability to work serious mischief in a class of cases like this, calls for some comment, as defendants protest against it most earnestly. I mean the granting of the injunction without notice. The statute (chapter 133, § 3) says : "Any court or judge may require that reasonable notice shall be given to the adverse party, or his attorney at law or in fact, of the time and place of moving for it, before the injunction is awarded, if in the opinion of the court or judge it be proper that such notice should be given." The very general practice is to require notice, especially where the plaintiff seeks to enjoin and restrain such operations as from their nature are liable to entail serious loss in being unexpectedly stopped; such as collieries, furnaces, oil wells and works of a like kind. In this instance constant working seems to be necessary to keep control of the accompanying salt water. Such practice is so exceptional in that class of cases that I take it for granted that

some good reason for its adoption must in this case have been made to appear, as that the mere act of giving notice might have been of itself productive of some of the mischief apprehended. In such cases the courts, on a proper showing, award injunctions without notice. See 1 Fost. Fed. Pr. § 231.

In this case if notice had been given, it is highly probable that it would have resulted in a temporary order for the occasion, satisfactory to both parties; and, if to nothing else, would surely have led to the requirement of an injunction-bond in a greater penalty than two thousand dollars, which is another ground of complaint. After the defendant appeared and moved for it, an additional bond in the penalty of twelve thousand dollars was required, and, I suppose, given, although this record does not show the fact. The order requiring an additional bond should have fixed a time within which it should be given, and, if not given within such time, that after the expiration thereof the injunction should stand dissolved until such bond be given; or some order of like effect that would enforce the giving of the new or additional bond, on pain of having the injunction dissolved. See *Mason* v. *Bridge Co.*, 17 W. Va., 396, 407.

The defendant also assigns as ground of error the refusal of the Circuit Court judge in vacation, on the hearing of his motions to dissolve the injunction, to read on his behalf certain *ex parte* affidavits taken without notice, to the reading of which plaintiffs objected. On a motion to dissolve, on filing the answer, the common practice in this state has been to read affidavits taken without notice in support of the equity of the bill, and counter affidavits taken in like manner in support of the denials of the answer; but where the answer sets up new matter to repel or avoid the equity of the bill the court may very properly require that plaintiff shall have an opportunity to be present when such affidavits are taken, otherwise he may be taken by surprise. On this matter, however, the court below must have a considerable latitude of discretion, in order to give a fair hearing on the motion to dissolve, and may require the affidavits in general to be taken on notice. But these affidavits

are regarded as read on this hearing, and they do not call for any modification of the present conclusion reached.

This brings us to the important practical question, what order ought the court to have made on the hearing of defendant's motions to dissolve the injunction? It should have dealt with the case as though the rights of the parties should be finally held to be such as they have been herein shown provisionally to be—that is to say, defendant Joseph T. Jones should be regarded as the owner in fee of three undivided tenth parts of the land in controversy, and of the freehold in the residue during the life of the plaintiff Eliza Williamson, with a vested remainder in fee simple to the sisters, *etc.*, of Eliza Williamson in the said remaining seven undivided tenth parts, according to and under the will of David Hickman, deceased; that defendant Jones is rightfully in possession according to his rights and the rights of his co-owners in the inheritance, with the right to extract and sell the oil, provided he does not take more than his share, as it appears that he has already occupied the whole property with oil wells to about its full profitable capacity. Such shares might be three tenths of the net proceeds—that is, after deducting all expenses incident to the working, and making a proper allowance, if any, for what he may be entitled to as the owner of said life estate formerly owned by Eliza Williamson; but until the final hearing let defendant Jones be charged with seven tenths of the customary royalty in the Sistersville oil field before it was developed, say one eighth of the oil produced, as such customary royalty, delivered into the pipe-line; and the order of the 25th day of August, 1893, should be modified accordingly—that is to say, instead of causing all the product of the wells or the proceeds of its sale to go into the hands of the special receivers, cause them to take control of seven tenths of said royalty, to be sold, *etc.*, and proceeds held to await the final decree of the court, so as to leave to defendant Jones as far as possible, consistently with the rights of his co-owners, full possession and control of what has been provisionally determined to be his own; he being shown to be solvent and responsible, and an energetic, experienced and skillful oil operator; and it being to the interest of all that the wells

be kept in operation under skillful and prudent management.

The cause is remanded, with directions to the Circuit Court of Tyler county to so modify its orders in the cause as to make them conform to and carry out, as near as may be, the views herein expressed, and directions here given, until this cause shall be finally heard.