# WHEELING.

## WOOD COUNTY PETROLEUM CO. v. WEST VIRGINIA TRANSPORTATION CO.

\*(JOHNSON, PRESIDENT, Absent.)

Submitted June 17, 1886.—Decided July 3, 1886.

1. Natural or hydro-carbon gas, which issues by its own force from the earth, is not absolute property but the subject of qualified property only.

2. A landlord leased to his tenant certain premises for the purpose of mining and taking carbon-oil therefrom at a fixed royalty and for no other purpose; the tenant opened a well which produced both oil and hydro-carbon gas, the former in small quantities pumped from the well for which the royalty is paid, and the latter in large quantities, issuing by its own force from the well, and which is separated from the oil by the tenant, and by means of pipes conducted beyond the leased premises where it is either sold or appropriated by the tenant for his own use without accounting to the landlord therefor. In a suit brought by the landlord for an account and the value of said gas, HELD :

The tenant is not accountable to the landlord for said gas or its value.

*Related to parties in interest.

*W. L. Cole* for appellant.

*A. I. Boreman* for appellee.

SNYDER, JUDGE:

Edmund Gale and wife, the owners of a certain tract of land located in the "oil regions" in Ritchie county of this State, entered into an agreement with M. C. C. Church, dated January 17, 1871, by which they leased to him a specified portion of said land, "for the purpose of mining and excavating for rock or carbon oil" and "for said purpose only" for the term of fifteen years from said date, the lessee "to have the privilege of using sufficient wood from the premises to run the necessary engines for the purpose of pumping, excavating and protecting the oil, and timber to erect all necessary buildings for said purposes," and he is to commence operations within sixty days and proceed without avoidable delay and, if he fail to do so or to work or cause the premises to be worked for petroleum for ninety days without good cause or the written consent of the lessors, the lease shall be deemed forfeited, and the lessors may enter without further notice. The lessors "are to fully use and enjoy the said premises for the purpose of tillage or any other purpose except that part which shall be actually necessary for the said mining purposes and a direct way over and across the premises to the place of mining or excavating oil." In consideration of said grant and demise the lessee is to pay and deliver to the lessors or their assigns one full equal fourth part of "all the carbon or rock oil pumped, raised or manufactured from or upon said premises during the whole term aforesaid." It is also stipulated, that "this lease is subject in all cases to the exclusive right of the West Virginia Transportation Company to transport oil and other liquids through pipes or tubing in, through or under the lands hereby leased;" and that "this lease may be assigned or sublet or transferred by the consent" of the lessors. The other provisions need not be stated.

By conveyances subsequently made by the said Gale and wife to Thompson Leach and others, doing business under the name of The Wood County Petroleum Company, the latter became the owners of said land with all the rights, remedies and royalties of the said Gale and wife in and to

said leased premises. On February 12, 1883, the said Wood County Petroleum Company brought this suit against the said M. C. C. Church, The West Virginia Transportation Company and The Bradish Oil Company. The plaintiff's bill, among other matters not in controversy in this appeal, avers, that in the fall of the year 1882 the defendant, Church, or some one under him, drilled a well on said leased premises not with the expectation of obtaining oil but for the purpose of obtaining natural gas to be used as fuel in generating steam necessary to operate the engines and machinery used in the production and transportation of oil; that the well so. drilled did at once and continues to produce large quantities of inflamable gas; that the defendant, The West Virginia Transporation Company, of which the said Church is the secretary, treasurer and general superintendent, is engaged in dealing in oil for profit and to some extent in producing oil, but its chief business is the transportation of oil for others as well as for itself through lines of pipe or tubing and by means of steam machinery located at different stations, which lines of pipe or tubing are connected and extend to different points in said "oil region" and to the railroad and to the city of Parkersburg; that said Church is also the president of the detendant, the Bradish Oil Company, which is a corporation engaged in producing and trading in oil for profit; that the plaintiff is not informed, whether said well produces any oil or not, but avers, that the gas produced therefrom is used for fuel as a substitute for coal and other fuels and has a market value, and by direction of said Church the said gas is conducted through the lines of pipe of said Transportation Company to its pumping stations, some of which are beyond the boundaries of the leased premises, and is there used and consumed in large quantities by said company as fuel for generating the steam to operate its machinery; that by like direction and means the said gas is used for operating oil-wells of the defendant, The Bradish Oil Company; that the gas so used and consumed by the defendant, Church, and said companies, is worth to them in the aggregate five dollars per day, and that they have been using the same continuously since November 1, 1882, and are still using it; that the plaintiff has demanded pay from said defendants for said gas, but they

refuse to pay for the same; that neither the said Church nor any one for him has reported the production of any oil from said well nor paid any royalty for such production ; that neither the said Church, nor any other person under him, nor either of the said companies, has any right or authority to use or appropriate said gas or make the same a source of profit to him or them, and that the actings and doings of him and them in respect to said gas are wholly unauthorized by the provisions of the lease aforesaid and in violation thereof, to the great injury and damage of the plaintiff. The prayer of the bill is, that the defendant, may answer as to the value to them of the gas used by them, respectively, and for what purposes ; whether any oil is produced from said well with the gas and, if any, what quantity ; that an account may be taken of the value of said gas and a decree entered for the same against the defendants liable therefor ; that the defendants may be enjoined from conducting any gas from said well or from disposing of or using the same in any manner. &c.

The injunction was awarded as prayed for in the bill.

The defendants, M. C. C. Church and The West Virginia Transportation Company, filed their joint and several demurrer and answer to the bill. The demurrer was overruled by the Court, and the plaintiff replied generally to said answer. These defendants in their answer say, that in the fall of the year 1882 the said West Virginia Transportation Company, in its own name and for its own benefit, undertook to develop said leased premises ; that at that time the said well was not producing oil sufficient to pay for working it, and said company then deepened said well for the purpose of producing oil, and that from said well and another well contiguous thereto oil was and ever since has been produced in small quantities ; that said well, in addition to the oil obtained therefrom, produced a considerable quantity of natural inflammable gas, which was up to the time of the granting of the injunction used by said company for the purposes and in the manner alleged in the bill. They further aver, that the presence and issuing of gas is, to a greater or less extent, a natural and inevitable incident to the sinking of all oil-wells, and that this has been verified by an experience of nearly twenty years in the region where said gas-well is located ; that the said gas

has been obtained from said well, because said company has drilled and operated the same in pursuance of the terms of said lease, and that it could not possibly have done so without occasioning the flow of gas; that, the said gas being thus the natural incident of the production of oil from said well and inseparable therefrom, the same belongs to said company; that the grant of the right to mine for oil only, necessarily included all the incidents to said grant, one of which was the right to said natural gas; and therefore under a fair and legal construction of the terms of said lease the plaintiff has no right, title or claim to said gas, and these defendants therefore deny the right of the plaintiff to call upon them or either of them for an account of said gas or the value thereof.

Upon the issue thus made by the bill and answer, the court by its decree of July 7, 1883, adjudged, that the plaintiff was entitled to recover from the defendants, Church and the West Virginia Transportation Company, some compensation on account of the gas produced and consumed from said well and referred the cause to a commissioner with directions to him to report the value of said gas, &c. By the same decree the injunction was modified so as to permit the defendant, Church, to use and appropriate said gas upon rendering an account of the amount and value of the same so used and appropriated. The gas during the pendency of the injunction having escaped into the air and was there burned whereby it was of no use to any one.

On June 30, 1885, the court decreed, that the plaintiff recover from the defendant, The West Virginia Transportation Company, as the net value of the gas taken and used by it from said well, the sum of $1,931.46 with interest and the costs of this suit. It is from this and the aforesaid decree of July 7, 1883, that said company has appealed to this Court.

It is not definitely ascertainable from the pleadings, whether the plaintiff seeks to recover from the appellant as an occupant of the premises under Church and by virtue of the lease to him, or whether the appellant is sought to be made liable for the gas appropriated by it as a mere trespasser unconnected in any manner with the lease to Church. It therefore becomes necessary to consider the claim of the plaintiff in both these aspects.

1. We will assume for the present, that the appellant, The West Virginia Transportation Company, in its use and appropriation of the gas acted as the rightful assignee of the lease and as possessing all the rights and privileges to and upon the leased premises, which the said lease or agreement of January 17, 1871, conferred upon the said Church, and that it occupied the place of the lessee in said agreement. According to this assumption it is plain, that the appellant had legal possession of the premises and the right to sink wells thereon for rock or carbon oil, with the exclusive privilege of using the same, so far as might be necessary, for mining, pumping and removing said oil to any extent it should deem advisable. The only restriction upon such use was the right of the lessors to the surface for any purpose, which did not interfere with such use of the lessee. While the grant is for the specific purpose of mining for and removing carbon oil and for none other, still there is necessarily included in this grant all the incidents essentially or naturally pertaining to its enjoyment. Included in these are the elements, such as light, air and water. And having the legal right to enter upon and occupy any portion of the premises the appellant could, without becoming a trespasser or incurring any liability to the lessors, use and appropriate anything it might find thereon, which is not the property of another, such as animals *feræ naturæ*, or waters percolating through the land, even though by such use and appropriation it may deprive another, having an equal right, of the power to do so. These are not the subjects of absolute property, and being therefore *jure naturæ* capable of a qualified ownership only, they belong to him who first appropriates them. 2 Kent's Com. 347 ; 2 Washb. on R. P. 327, (72) ; *Acton* v. *Blundell*, 12 M. & W. 324.

If the hydro-carbon or natural gas now in controversy belongs to the class of things, which are incapable of being absolute property but are the subject of qualified property only, such as those above mentioned, then it is clear this gas was not the property of the plaintiff, and the appellant is not liable for its use and appropriation ; but if on the other hand said gas is susceptible of absolute ownership, then it is a part of the realty of the plaintiff, to which the appellant acquired

no right under said lease, and is therefore liable to the plaintiff for the value of the same. The important and decisive inquiry in this cause is, therefore : To which category does hydro-carbon gas belong ?

In the article on "Gas and Gas-Lighting," in the Encyclopædia Britannica, it is stated, that "Inflammable gas is formed in great abundance within the earth in connection with carbonaceous deposits such as coal and petroleum ; and similar accumulations not unfrequently occur in connection with deposits ot rock-salt ; the gases from any of these sources escaping by means of fissures or seams to the open air may be collected and burned in suitable arrangements. Thus the 'eternal fires' of Baku, on the Caspian Sea, which has been known as burning from remote ages, are due to gaseous hydro-carbon issuing from and through petroleum deposits. In the province of Szechuen in China gas is obtained from beds of rock-salt at a depth of 1,500 or 1,600 feet ; being brought to the surface it is conveyed in bamboo tubes and used for lighting as well as evaporating brine ; and it is asserted that the Chinese used this naturally evolved gas as an illuminant long before gas-lighting was introduced among European nations. At a salt-mine in the Comitat of Marmora in Hungary gas is obtained at a depth of about 120 feet and is used for illuminating the works of the mine. Again at Fredonia, New York, a natural emission of gas was discovered in a bituminous limestone, over the orifice ot which a gasholder has been erected, and thus about 1,000 cubic feet of gas composed ot marsh gas and hydride of ethyl has been made available for illumination. · In the city of Erie, Penn., there are thirteen gas-wells, each yielding from 10,000 to 30,000 feet per day, the gas escaping from one of them at a pressure of 200 pounds per square inch. At Bloomfield, Ontario county, New York, there is a spring which yields daily no less than 800,000 feet of gas of an illuminating power equal to $14\frac{1}{2}$ candles. The city of East Liverpool, Ohio, is entirely illuminated, and to a large extent heated, by gas-wells which exist in and around that town. The light is of extraordinary brilliancy and is so abundant and free, that the street-lamps are never extinguished, and much of the manufacturing steam-power of the town, which embraces

twenty-two potteries, giving employment to 2,000 hands, is derived from the gas. The first well, 450 feet deep, was opened in 1859, and up to the present year, (1879) neither it nor any of those tapped at later dates show sign of failing. In many other parts of America similar gas-wells exist; and several such natural jets of gas have been observed in England."

To the above list may be added the gas-wells at Burning Springs in Wirt county and the Pontius well in Ritchie county this State, both of which are in the vicinity of the well in question in this suit; also the gas-wells in the neighborhood of Wellsburg in this State and the more recently opened gas-wells of Westmoreland and Washington counties, Pennsylvania, from which nearly all the iron-works and other factories of the city of Pittsburgh are operated and from which gas is now being brought to the city of Wheeling in this State to supply the factories of that city. From all of these wells the gas flows by its own pressure; and notwithstanding some of them have been in continuous operation for many years, there is no perceptible diminution of the supply. How this gas is formed, whether the supply is limited or inexhaustible, are problems of the future, which observation and experience, as yet, have failed to furnish the means of solving.

It is apparent from this history of the nature and properties of natural gas, that it partakes more nearly of the character of the elements, air and water, than it does of those things which are the subject of absolute property. It is more volatile than the air, and when tapped in the earth it escapes more readily. When the supply is withdrawn from one place, it flows of its own accord from other points and replaces that which has been withdrawn. What distance or from what source it comes is the subject of conjecture only. The well or means of escape may be on one farm or in one county, and the reservoir or source of supply may be under other farms or in other counties more or less distant. Like water percolating beneath the surface, it may by sinking a well or otherwise be appropriated for the use of one person on his farm, while the supply may come from an adjoining or many distant farms. The right of appropriation is so ab-

solute in the case of water flowing underground, that if the owner of land in digging a well or cellar or working a mine on his own premises cuts off the water, which by percolation supplies his neighbor's well, and thereby diverts it into his own or drains the well of his neighbor, the latter is without remedy; it is *damnum absque injuria*, if not negligently or maliciously done. (*Brown* v. *Illins*, 25 Conn. 594; S. C. 27 *Id.* 94; *Emporia* v. *Soden*, 25 Kan. 608).

It is not disputed that both air and water are the subjects of qualified property by occupancy. Every owner of land has the control of the use and appropriation of the air and water on his land, but this control can be asserted only by denying access to the land and not by demanding compensation from those who are in the rightful occupancy of the land. And having the right to exclude others from his land the owner may by contract provide, that those, who desire the air or mineral or other waters on his land shall pay him a stipulated price for the use of the same, and such a contract would be enforceable in law. But in such case the contract must be express, because the ownership is qualified, and the law will not raise an implication for the payment for the use of such property. These being incapable of absolute ownership they can not be the subject of compensation for waste or appropriation, where the access is ri htful, and where it is wrongful, the measure of damages wil' be limited to the injury done to the land.

By analogy, therefore, it seems to me, the rule and principles, which pertain to air and water and other subjects of the same nature, must be applied to the natural or hydro-carbon gas involved in this suit. Neither the developments of science nor the evidence in this cause establish, that such gas is likely to be exhausted by its use and consumption. That such may ultimately be the case, is possible, but the fact, if it is such, is not sufficiently certain or apparent to be the basis of a judicial decision. The appellant, therefore, could not certainly be guilty of either legal or equitable waste in the use of said gas. The well, through which the gas reaches the surface, was opened rightfully. The stipulations of the lease gave the lessee not only the possession of the land for the purpose of mining for oil, but it required him to sink wells

in order to prevent a forfeiture, and to keep the wells in operation to enable him to pay the agreed royalty upon the oil for the use of the premises. The motive, which induced the opening of the well in this instance, is immaterial, since oil was and continued to be produced from it. If no oil was or ever had been obtained from the well, the case might be different. But the proof here is, that this well produces both oil and gas, the former in small quantities, which is pumped into a tank and royalty paid therefrom, and the latter in larger quantities, which flows from the well by its own force or pressure.

If this were an open spring producing oil and gas, or such a natural emission ofg as as that at Bloomfield in New York, or that at the Burning Spring in Wirt county, instead of a well 1,000 feet deep, there could be no more question, it seems to me, as to the right of the lessee to appropriate the gas under the provisions of this lease, than there is of his right to use and consume the air and water upon the prem·ises. What difference then is there between these cases and the well in question, which was opened in express conformity with·the written terms of the lease? It is the same as if the well had been there before the lease was made. (*Kier* v. *Peterson*, 41 Pa. St. 357).

If the lessee should attempt to use the premises for the production of gas alone, that would certainly not prevent the operation of the forfeiture clause contained in the lease. Or, if the gas did not escape from the well of its own force, it is possible the lessee would not, against the consent of the lessors, be permitted to pump it from the well. But in this case, as it is essential that the well shall be kept open, in order that the oil may be pumped from it, and as the gas issues of its own accord from the well so necessarily and rightfully kept open, it is clear that the lessee, in the absence of any stipulation for compensation, has the right to use and appropriate the gas in any proper manner he may choose without accounting therefor to the lessors. It necessarily results from this conclusion, that, if the appellant here rightfully occupied the position of the lessee in said lease, then it is not accountable to the appellee for the gas used and appropriated by it from said well.

2. It is apparent that very little need be said on the alternative of this cause, which assumes that the claim asserted by the plaintiff is against the appellant as a simple trespasser, entirely unconnected with the lease to M. C. C. Church. If, as before stated, this gas was not susceptible of absolute ownership but the subject of ·qualified property only, as there can be no title or right to such property except by possession or appropriation, the plaintiff not having the possession could have no property in it, and consequently it could not legally claim compensation therefor from the appellant. The fact, that the plaintiff had the title to and possession of the land would give it the legal right to recover damages from the appellant for any injury done to it by trespassing thereon. But the appropriation of the gas would not enter into the estimate of such damages, because, as we have seen, such appropriation would be regarded as *damnum absque injuria.* It would no more be a part of such damages than would the consumption of the air or water by a trespasser upon the premises. And for the injury done to the land or the possession thereof the remedy is ample at law, and no one would contend that relief in such case could be sought in a court of equity.

By reason of the novelty of this cause it has been given a careful consideration, and for the reasons assigned I am of opinion, that the decrees of the circuit court are erroneous, and that therefore they must be reversed and the cause remanded for further proceedings to be had therein as to the matters not brought before us by this appeal.

REVERSED. REMANDED.